UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:16 CR 00005** |
| **v.** | : | |
| | : | **The Honorable John D. Bates** |
| **ROBERT APPERSON,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S MEMORANDUM FOR PRETRIAL DETENTION

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its motion for pretrial detention of the defendant. In support of this motion, the United States relies on the following points and authorities and such other points and authorities as may be cited at any hearing on this matter:

### Background and Statement of Facts

1. On July 28, 2016, the Grand Jury returned an indictment charging defendant ROBERT APPERSON with conspiracy to distribute and possess with the intent to distribute 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, a schedule II controlled substance and 1 kilogram of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(i) and (ii). By statute, this offense carries a term of imprisonment a mandatory minimum of ten (10) years of imprisonment up to life imprisonment, a fine of $10,000,000 and a term of at least five years of supervised release.

2. In the fall of 2014, FBI/MPD task force members in Washington, D.C. began an investigation into the activities of a local cocaine trafficker. The investigation has since continued into the drug trafficking activities of RASONNE BELL, RICHARD SOLOMON,

MAURICE CRUCTHFIELD, LEON JACKSON, RODNEY SIMMS, DANNY GAY and others. At the earlier stages of this investigation, task force officers began purchasing various amounts of suspected cocaine from the local cocaine trafficker using an undercover officer.

3. As part of this investigation, authorization to intercept the wire and electronic communications of several individuals was granted by the Honorable Tanya S. Chutkan, of the District Court for the District of Columbia, including those of RASONNE BELL, using 202-256-9474 (Misc. 15-948 (TCS)), (hereinafter TT#5). Interceptions occurred almost continuously from between July 31, 2015 and January 8, 2016. Authorization was also granted to monitor another BELL telephone, 202-749-3462 (Misc. 15-1626 (TSC)) (hereinafter TT#6). Interceptions occurred from between November 13, 2015 and January 8, 2016.

4. The investigation has revealed that BELL is supplied with both cocaine and heroin from RICHARD SOLOMON (who is a New York City based supplier) and that BELL in turn, supplies individuals with those drugs which were acquired from SOLOMON. For example, based on prior interceptions, law enforcement was able to stop SOLOMON in Maryland and recover about 8 ounces of suspected heroin on September 19, 2015 and stop BELL in Philadelphia, Pennsylvania and recover about two kilograms of suspected cocaine and 300 grams of suspected heroin on January 8, 2016.

5. BELL was initially arrested on January 7, 2016 while in possession of over 2 kilograms of suspected cocaine and approximately 300 grams of suspected heroin.

6. In the weeks leading up to the arrest of BELL, law enforcement learned that BELL has been working in Philadelphia and staying over most weeknights at the Hilton Garden Inn, located at 1100 Arch Street, Philadelphia, PA. Law enforcement also learned that BELL has

also been traveling back and forth between Washington, D.C. and Philadelphia to facilitate narcotics transactions and to meet with co-conspirators.

7. Beginning on January 4, 2016, law enforcement agents established a surveillance post in the Hilton Garden Inn, specifically, a hotel room located across the hall from Room 923. Room 923 is currently rented to an individual named "Jason Silks," but is known by law enforcement agents through surveillance to be used by BELL. Between January 4, 2016 up to and including January 7, 2016, law enforcement agents observed BELL enter and exit Room 923 with a key card on numerous occasions. For example, on evening of January 6, 2015, law enforcement agents observed that BELL entered Room 923. During the course of the evening, law enforcement agents were able to hear BELL's voice talking on a telephone from across the hall in their own hotel room.

8. On January 7, 2016 at 12:22 p.m., BELL made a call to GAYE at telephone number 301-832-2905 (Activation #1170, TT#6,). BELL asked GAYE, "What time can you get up here?" To which GAYE replied, "I'm about to hop in the shower and I can be on my way right now." Followed by, "Shoot me an address and I'll put it in the GPS, and I'm on my way." BELL responded, "that's what I'm going to do." Activation #1171, at 12:24 p.m., BELL made a call to SIMMS at telephone number 202-702-2238. BELL informed SIMMS, "I got my nephew coming, and I'll take the train back, I can't drive back and forth, that's too much." Activation #1173, at 12:56 p.m., BELL sent a text message to GAYE at telephone number 301-832-2905. BELL sent the message, "1100 Arch St Philadelphia Pa." This is the address for the hotel that BELL is staying in, in Philadelphia. Activation #1175, at 12:56 p.m., BELL made a call to GAYE at telephone number 301-832-2905. GAYE stated to BELL, "I'm on the way." The

government submits that that BELL anticipated the arrival of narcotics from New York to his location in Philadelphia. BELL requested that GAYE make the trip from Washington, DC to provide BELL a ride back, in order to provide the narcotics to BELL's drug customers in the Washington, DC area.

9. At approximately 1:30 pm, law enforcement officers initiated surveillance in the vicinity of the Hilton Garden Inn. At approximately 2:01 p.m., BELL was observed departing Room 923 wearing a black hat, black coat, and black pants. At approximately 2:11 p.m., BELL returned to his room accompanied by a black female carrying a large pinkish in color shoulder bag. BELL and the female departed the room at 2:14 p.m., and the female still had the shoulder bag on her person. Law enforcement observed them walking together south on 11th Street before they went separate ways a couple of minutes later.

10. The female then entered the Burlington Coat Factory, located at the northeast corner of 11th Street and Market Street in Philadelphia. The female was stopped by Philadelphia Police Officer Joseph Hanson and advised that she was under suspicion of shoplifting. The female told Officer Hanson that she was comparing a scarf in her shopping bag to a coat. Officer Hanson advised the female that he was going to check the camera and stepped away from the female. When Officer Hanson returned, the female was irate and dropped the bag to the ground. At that time, Officer Hanson observed the bag to contain several spools of yarn. The female advised she did not have identification and was released from investigation.

11. At approximately 2:35 p.m., BELL departed from the area in his silver Mercedes sedan, which had been parked in the parking garage located above the Hilton Garden Inn. BELL traveled to North Philadelphia.

12. At approximately 3:50 p.m., a white Toyota Tundra pick-up truck, bearing Maryland license plates 64583CF, parked on the south side of the 1100 block of Arch Street, near the Arch Street entrance to the Hilton Garden Inn. The driver, later identified as DANNY GAY, remained in the driver's seat.

13. At approximately 4:24 p.m., BELL returned to the parking garage located above the Hilton Garden Inn and parked his Mercedes sedan. At approximately 4:28 p.m., BELL approached the driver's side door to the Toyota Tundra pick-up truck driven by GAY. GAY exited the truck, BELL appeared to pay an electronic parking meter, and then both BELL and GAY into the lobby of the Hilton Garden Inn. At that time, law enforcement agents did not observe either BELL or GAY carrying any bags. At approximately 4:36 p.m., law enforcement agents observed BELL and GAY entered Room 923 without any bags. At approximately 4:39 p.m., both BELL and GAY exited Room 923. At that time, law enforcement observed that BELL was carrying a black duffle bag.

14. At approximately 4:44 p.m., BELL and GAY exited the hotel lobby and approached Toyota pick-up truck. At that time, BELL was still carrying a black duffle bag. GAY got into the front passenger seat the truck. BELL placed the black duffle bag behind the driver seat and then got into the driver's seat of the truck. They departed west on Arch Street, made an immediate left turn to travel south on 12th Street, and made another immediate left turn to travel north on 11th Street. The truck then made a right hand turn to travel east on Race Street, where Philadelphia Police Officer Michael Haas initiated a traffic stop in the 1000 block of Race Street.

15. Officer Haas advised he stopped the vehicle because the truck had post-market

tint on the rear window, as well as the rear driver side and rear passenger windows. Officer Haas approached the driver, BELL, and asked for his driver's license and registration. Officer Haas noticed that the vehicle was not registered to the driver. Officer Haas asked the passenger, GAY, if the truck belonged to him and GAY indicated that it did.

16. Sergeant Andrew Callaghan of the Philadelphia Police spoke with BELL and GAY during the traffic stop. Sergeant Callaghan advised them that the vehicle matched a suspect vehicle involved in a robbery.[1] Sergeant Callaghan asked for consent to search the vehicle; however GAY declined. GAY advised that he was not comfortable with consenting to a search because it was actually his grandfather's truck.

17. At approximately 5:15 p.m., K-9 "Jake" and his handler, Officer Quirple arrived on the scene. BELL and GAY were removed from the vehicle. Pursuant to a positive indication for the presence of narcotics by K-9 Jake on the left and right doors to the vehicle, Officer Haas and Officer Krewer searched the interior passenger compartment and located a large black nylon duffel bag located on back seat behind the driver's seat. Located under the duffel bag was a box of heat sealable plastic bags. Inside of the duffel bag three off-white rectangular shaped objects were observed, each in heat sealed plastic bags consistent with bulk narcotics packaging. Item #1 was off-white, rectangular shaped and solid, wrapped in clear plastic wrap and sealed inside of a heat-sealed plastic bag, consistent with the appearance of a kilogram of cocaine. A raised symbol or word imprint could be observed on one side. The number "1024" was written in blue ink on one corner of the clear plastic wrap on the same side. Item #2 was off-white, rectangular shaped and solid, wrapped in clear plastic wrap and sealed inside of a heat-sealed plastic bag,

---

[1] It should be noted that the vehicle did not in fact match a suspect vehicle involved in a robbery and this was a ruse to initially conceal the fact that law enforcement had probable cause to believe BELL and GAY were taking drugs back to Maryland and Washington, D.C.

consistent with the appearance of a kilogram of cocaine. The item was wrapped around the middle with light blue duct tape with penguins. The number "1068" was written in blue ink, and the word "ENANO" or similar was written in black ink on three locations. Item #3 was off-white, rectangular shaped and solid, wrapped in clear plastic wrap and sealed inside of a heat-sealed plastic bag, consistent with the appearance of bulk heroin.

18. All three items were transported to the FBI Philadelphia office for processing. Items #1 and #2 field tested positive for the presence of cocaine. Item #3 field tested positive for the presence of heroin. The items were individually packaged for evidence submission and weighed. Total package weights were: Item #1 (cocaine) – 1066.75 grams, Item #2 (cocaine) – 1110.70 grams, Item #3 (heroin) – 295.25 grams.

19. BELL and GAY were placed under arrest. Subsequent searches revealed that GAY had $3470.25 on his person and BELL had $241.65 on his person. Two cellular phones were recovered from GAY and four additional phones were recovered inside of the truck.

20. On January 7, 2016, law enforcement agents executed a search warrant at Room 923 at the Hilton Garden Inn. Law enforcement agents recovered approximately 50 grams of suspected heroin and approximately $11,000 in United States currency, among other items.

21. On January 8, 2016, law enforcement conducted a traffic stop on vehicle driven by SIMMS in the area of Culpeper County, Virginia. Geo-location data from SIMMS's cellular telephone showed that on January 7, 2016, SIMMS's phone traveled from Culpeper to the Washington, D.C. area, where it stayed overnight. On January 8, 2016, geo-location data showed SIMMS's phone traveling back towards Culpeper County, Virginia. During the course of the traffic stop, law enforcement located approximately $26,000 in cash in plastic bags in the

vehicle. At that time, SIMMS was placed under arrest.

22. That same day, the mother of SIMMS's child gave law enforcement written consent to search the residence where she and SIMMS lived in the Highpoint area of Culpeper County, Virginia. During the course of that search, law enforcement located approximately 106 grams of suspected heroin, approximately 249 grams of suspected crack cocaine, and approximately 13 grams of suspected cocaine. These items were located hidden within plastic containers in the kitchen of the residence. In addition, law enforcement officers located a 9 mm Smith & Wesson handgun in the master bedroom.

23. Through the course of this investigation, law enforcement learned that APPERSON and SIMMS operated as partners in this narcotics trafficking conspiracy. APPERSON and SIMMS pooled money to purchase large amounts of cocaine and heroin, which they distributed throughout Culpeper, Virginia. During the course of this investigation, law enforcement have intercepted numerous conversations between SIMMS and his co-conspirator BELL, in which SIMMS has discussed his and APPERSON's involvement in the distribution of narcotics. The following are a summary of the calls in which SIMMS and BELL discussed narcotics transactions involving APPERSON, to whom SIMMS and BELL referred to as SIMMS's "nephew."

24. Activation #45, TT#6, November 17, 2015, at 7:57 a.m., BELL called SIMMS at 202-527-2531. SIMMS told BELL, "Hey listen on this time. I told him I said um, I said if he do that, I don't know if he is. I am trying to get the whole joint you hear. I don't know of you was listening but I said I will probably just have to owe him on the half. But on the half, I want you to probably give me another, man another 9, because I my shit go fast. I go through mine the white

girls faster than, you know what I'm saying. I got you back, it's going to probably a half and a cutie. That will probably be like 30, I'll probably be right back because....I am probably bringing like 40 myself and he bringing 40, so that 80. You know what I'm saying with him it's going to be taken care of and I'm probably going to owe him like 28 more." Here, SIMMS explained to BELL that he and APPERSON were each going to bring BELL $40,000, for a total of $80,000 to purchase narcotics, but that SIMMS would end up owing APPERSON $28,000. BELL told SIMMS: "Look I want to see you fly. If you flying you...one thing I know about me I'm the type man slim I love you to death slim. I am never never ever hold you back. If I gotta make a way I make a way like I always do." SIMMS responded: "Same here, that's what I was saying about the white girl. I know I said about the half and then I need an extra 9 and I should be good. See he got the people to where he breaks his down. Because he got everybody. I don't really know a lot of people and don't want to know a lot of people. The people I know is just straight balls and O's, you know what I'm saying. I just do it like that. I just sell straight balls. See I do it like this. I only sell it for 14 a joint, but see if I get a extra 1 or 1 1/2 for joint that's my money then I get 200 off each ounce and 1 1/2 I'm cool. If I can get it for somewhere like that because if it's 55, or somewhere in there, I'm gonna get something. I ain't trying to be greedy." Here, SIMMS explains to BELL that APPERSON has a network of people who help him convert the cocaine into crack cocaine and to sell it to a network of customers.

25. Activation #103, TT#6, November 18, 2015, at 11:10 p.m., SIMMS calls BELL from 202-527-2531. SIMMS informed BELL that his "nephew still has, what he'd say he has? Like, 12-5 or 12-7, I know I get can that, I know that probably will be done. You know, I did

numbers today like Usher." Here, SIMMS provides BELL with an update the status of SIMMS's and APPERSON's distributions.

26. Activation #239, TT#6, November 28, 2015, at 3:30 p.m., SIMMS called BELL from 301-646-3301. SIMMS said he had not gotten a call yet and BELL said he had not gotten a call either. SIMMS then said, "I said, Slim, I wanted the whole joint again but I said I need at least 750 because my nephew was like, fuck it, if he ain't got a whole one, I'll take 250 and you take a 500. I said I want them joints in a sack." BELL said, "Nah, he better bring all 1000 your way. Let me tell you something, them other jokers ain't even coming COD. . . I'll get an ETA on that." Here, SIMMS requested one full kilogram of heroin, and stated that APPERSON wanted on quarter of a kilogram, but SIMMS would settle for three quarters of a kilogram.

27. Activation #270, TT#6, November 29, 2015 at 2:37 p.m., SIMMS called BELL. SIMMS said, "I'm trying to make a play where I can just send my nephew." Activation #271, 2:42 pm, BELL called SIMMS at 202-257-2531. BELL said, "I just talked to him, he's not that far away from me." (This is likely the courier but BELL had not had any calls with anyone on TT#5 or TT#6 about possible meeting locations). SIMMS said, "I know you're sending me all the packaged ones." BELL said, "Four." SIMMS said, "Three." BELL said, "Oh, you only want three of them?" SIMMS said, "Oh, ok, . . .I got damn near the money. . .I was gonna get the two, he was gonna get the one. . . there's 42. I know I got at least 37." BELL said, "Slim just called and he's coming this way."

28. Activation #286, TT#6, November 29, 2015, 9:46 p.m., SIMMS called BELL from 202-257-2531 and explained, "My nephew wants one of them bags and I'm getting two. I'm trying to figure out if I want you to go ahead and send the other one, because I'm sitting here

thinking about . . . I got so many people on hold, by the time I collect everything. . . I know I got 40 in the house. . . You said you got four of them in a pack, right?" BELL said yes. SIMMS resumed discussing how he did not know when they would discharge his wife from the hospital and that he did not want BELL to take 'it' to work. SIMMS ended with, "I think I'm gonna get the whole four." Here, SIMMS planned to get four 250 grams packages of heroin from BELL for SIMMS and APPERSON.

29. Activation #481, TT#6, December 3, 2015, at 11:09 p.m., BELL sent a text message to SIMMS at 202-527-2531 which read, "Stop tell slim the amount of the change because 3150 of that was mines, plus what he owes from last time." This references an amount SIMMS owes. Activation #483, TT#6, December 3, 2015, at 11:11 p.m., SIMMS called BELL from 202-527-2531 and started complaining about the alleged miscount, "My whole thing . . . slim, do he got a key and is he in the house, because I know I don't miscount, but I know you ain't going to take nothing from me. . . I know I counted 44. Like my girl said, I could see if you were like 400 off but 2500, you ain't never been off like that." (Here, SIMMS is asking whether SOLOMON, who stays with BELL, could have taken some part of the $44,000.00 that SIMMS sent.) BELL said, "It's all great, trust me. . . the only person I'm concerned about is your people." SIMMS asked, "Who, my nephew?" SIMMS complained that the nephew owed him "$19,000.00" and "he's got it for real, he's holding onto it." SIMMS further complained that the nephew made "50" three days in a row, but still he didn't pay SIMMS. SIMMS told BELL that he and his nephew were already in business before BELL "got back on."

30. In addition, an October 9, 2015, law enforcement established surveillance at the Virginia Hospital Center, BELL's place of employment after intercepted calls indicated that

BELL and SIMMS planned to meet there that morning. Around 9:52 a.m., law enforcement observed SIMMS approach BELL's parked car, and BELL arrived a minute later. After speaking for a few minutes, BELL opened the trunk and SIMMS grabbed a black shopping bag and an item wrapped with white paper. Law enforcement followed SIMMS as he walked to a Nissan SUV bearing Virginia license places 7BZ8330. S/A Hartman observed SIMMS get into the vehicle and followed the vehicle as it drove away, which allowed S/A Hartman to get a view of the driver. The license plates were registered to Enterprise, who informed S/A Hartman that the vehicle was rented to Robert APPERSON. S/A Hartman reviewed APPERSON's photo in a DMV database and confirmed that APPERSON was the driver of the vehicle on October 9, 2015. Records obtained from Enterprise confirm that APPERSON rented a Nissan Rogue SUV from September 25, 2015 through October 17, 2015.

31. Since the arrest of BELL, SOLOMON, SIMMS, and other members of this conspiracy, APPERSON has continued to distribute cocaine and heroin throughout Culpeper, Virginia. APPERSON continued to supply his girlfriend, Claire STINNETT with heroin for distribution. Between January 28, 2016, and March 23, 2016, law enforcement conducted four controlled purchases of either one half gram or one gram of heroin from STINNETT in Culpeper, Virginia through the use of confidential sources.

32. On March 23 2016, STINNET was arrested during a traffic stop in Culpeper, Virginia. At that time, STINNETT had just left a residence out of which STINNETT is known to sell heroin. Early that evening, officers observed a vehicle arrive at the residence and exit a short time later. The vehicle drove to a nearby shopping center. Officers approached the vehicle on foot, and then observed the driver pulling a needle out of his arm. A that point in time, the

officer ordered the driver to show the officer his hands. The driver threw the needle on the floor and drove off at a high rate of speed. The suspect was soon taken into custody. The driver was advised of his Miranda rights, and informed officers that he had just purchased heroin from STINNETT at that residence. After STINNET left that residence, law enforcement conducted a traffic stop, and placed STINNETT under arrest for distribution of heroin. A search of STINNETT's vehicle uncovered several grams of suspected heroin packaged in individual baggies hidden within a screwdriver.

33. STINNETT was advised of her Miranda rights and provided a lengthy statement to law enforcement. As part of that statement, STINNETT indicated that she had met APPERSON approximately six months earlier and that they had developed a romantic relationship. STINNETT indicated that during that six months, she had obtained heroin and cocaine from APPERSON to distribute (as well as heroin for her own personal use). STINNETT indicated that she obtained 6 grams of heroin from APPERSON once or twice a day and that she occasionally got an additional gram or two of heroin from APPERSON when he came over in the evenings. APPERSON provided her the 6 grams of heroin at a price of $350. STINNETT estimated that she had sold heroin to around 100 different people, but that she consistently sold heroin to a group of approximately 10 people. STINNETT explained that SIMMS was APPERSON's partner and provided information about stash locations used by SIMMS and APPERSON.

34. Utilizing a confidential source, members of the Blue Ridge Task Force conducted three controlled purchases of narcotics from APPERSON in recent weeks in Culpeper, Virginia. Specifically, on June 29, 2016, the confidential source purchased

approximately 1.5 grams of cocaine from APPERSON in exchange for $100. On July 7, 2016, the confidential source purchased approximately 3.5 grams of cocaine from APPERSON in exchange for $175. On July 11, 2016, the confidential source purchased approximately 7 grams of cocaine from APPERSON in exchange for $350.

35. As described above, STINNETT was arrested on March 23, 2016 and held without bond on distribution charges in Culpeper, Virginia. Although she remained held without bond, STINNETT was later sent to a rehabilitation facility known as the Farley Center, located in Williamsburg, Virginia. On April 24, 2016, STINNETT reportedly overdosed and was transported to the Williamsburg Sentera Regional Medical Center, located in Williamsburg Virginia.[2] Prior to the reported overdose, STINNETT received a visit from an individual identified by the Farley Center only as her fiancé. On the morning of April 25, 2016, STINNETT was recorded on hospital surveillance video leaving the hospital with APPERSON. On April 26, 2016, law enforcement conducted a traffic stop on a vehicle driven by APPERSON near the Hampton Tunnel, which connects Norfolk and Newport News, Virginia. A female passenger in the vehicle identified herself as "Angela Bigelow" and law enforcement released the vehicle. Later, the law enforcement officer identified "Angela Bigelow" as STINNETT after viewing a photograph of STINNETT. STINNETT was rearrested in Prince William County, Virginia on May 1, 2016.

## APPLICABLE LAW

36. Here, the government has requested a pretrial detention hearing under a provision of the Bail Reform Act, 18 U.S.C. § 3142(f)(1)(C), which provides that a judicial officer "shall

[2] Law enforcement later interviewed STINNETT's father, who reported that STINNET informed him that she faked the overdose to be admitted to the hospital.

hold a hearing to determine whether any condition or combination of conditions set forth in subsection (c) of this section will reasonably assure the appearance of such person as required and the safety of any other person and the community" upon motion for a case that involves "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act." 18 U.S.C. § 3142(f)(1)(C). The Controlled Substance offense charged here meets these criteria, inasmuch as it is punishable by up to life imprisonment.

37. Under the statute, pretrial detention must be supported by clear and convincing evidence when the justification involves the safety of the community, and a preponderance of the evidence when the justification involves the risk of flight. *U.S. v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987). In considering either justification, the charged offense here (given that it is a Controlled Substances offense punishable by a maximum term of imprisonment of more than ten years and therefore meets the criterial of 18 U.S.C. § 3142(f)(1)(C)) carries with it a rebuttable presumption that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community" where a judicial officer determines that there is probable cause to believe that the person committed the charged offense. 18 U.S.C. § 3142(e)(3) and (e)(3)(A). By itself, an indictment establishes that probable cause and triggers the presumption. *See, e.g., United States v. Smith,* 79 F.3d 1208, 1210 (D.C. Cir. 1996) ("the indictment alone would have been enough to raise the rebuttable presumption that no condition would reasonably assure the safety of the community"). Furthermore, under the Bail Reform Act the government may proceed by way of proffer. *Smith*, 79 F.3d at 1210.

38. When considering the interplay of the statutory presumption and the "safety of any other person and the community" and "flight risk" justifications for pretrial detention, the

common sense reasons for both the Bail Reform Act and the statutory presumption's treatment of serious drug trafficking offenses should be kept in mind. Under the Bail Reform Act, 18 U.S.C. §§ 3142 et seq., "[t]he statutory language, as well as the legislative history, unequivocably establishes that Congress intended to equate traffic in drugs with a danger to the community." *United States v. Strong*, 775 F.2d 504, 506 (3d Cir. 1985). Its legislative history also "fully supports the conclusion that Congress intended to equate drug trafficking with danger to the community." *Strong*, 775 F.2d at 507. As noted by the D.C. Circuit:

> The legislative history indicates that the rebuttable presumption covering serious drug trafficking offenses was included because:
>
> "Persons charged with major drug felonies are often in the business of importing or distributing dangerous drugs, and thus, because of the nature of the criminal activity with which they are charged, they pose a significant risk of pretrial recidivism. Furthermore, the Committee received testimony that flight to avoid prosecution is particularly high among persons charged with major drug offenses. Because of the extremely lucrative nature of drug trafficking, and the fact that drug traffickers often have established substantial ties outside the United States from whence most dangerous drugs are imported into the country, these persons have both the resources and the foreign contacts to escape to other countries with relative ease in order to avoid prosecution for offenses punishable by lengthy prison sentences."

*United States v. Alatishe*, 768 F.2d 364, 370 n.13 (D.C. Cir. 1985) (quoting S. Rep. No. 225, 98th Cong., 1st Sess. 20 (1983), U.S. Code Cong. & Admin. News 1984, p. 3203). Thus, in creating a presumption of pretrial detention for serious drug trafficking offense, both the legislative history and the statutory language make clear that very "real-world" concerns lie behind the recognition of the inherent, pretrial dangers and flight risks posed by those who commit serious drug trafficking offenses.

39. To be sure, that presumption is rebuttable and does not shift the ultimate burden of proof from the government's shoulders. But it does create a burden of *production* on the

defense to submit at least some credible evidence that might purport to overcome it. And even if the defense does submit such evidence, the presumption remains as a factor that may be considered by the Court amongst others in determining whether the defendant should be detained, and the presumption retains "evidentiary weight." *United States v. Dillon*, 938 F.2d 1412, 1416 (1st Cir. 1991) ("When a defendant produces such evidence, however, the presumption does not disappear. The burden of persuasion remains on the government and the rebutted presumption retains evidentiary weight") (citations omitted); *United States v. Rueben*, 974 F.2d. 580, 586 (5th Cir. 1992) (the mere production of evidence [regarding flight risk for a drug offense] does not completely rebut the presumption . . . . In making its ultimate determination, the court may still consider the finding by Congress that drug offenders pose a special risk of flight and dangerousness to society" (citation omitted); *United States v. Rodriguez*, 950 F.2d 85, 88 (2nd Cir. 1991) ("Although the government retains the burden of persuasion, a defendant must introduce some evidence contrary to the presumed fact in order to rebut the presumption . . . . Once a defendant introduces rebuttal evidence, the presumption, rather than disappearing altogether, continues to be weighed along with other factors to be considered when deciding whether to release a defendant. . . . *see also United States v. Jessup*, 757 F.2d 378, 382-83 (1st Cir.1985) (rejecting "bursting bubble" approach)" (internal citation omitted)); *see also United States v. Ali*, 793 F.Supp.2d 386, 388 and 388 n.2 (D.D.C. 2011) ("Even if such contrary evidence or credible proffers are offered, the presumption remains as a factor to be considered by the Court amongst others in determining whether the defendant should be detained").

40. In making a pretrial detention decision, by statute a judicial officer must consider

four factors: 1) the nature and circumstances of the offense charged, including whether the offense involves such things as a controlled substance or a firearm; 2) the weight of the evidence against the person; 3) the history and characteristics of the person; and 4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g).

41. Here, the first factor, the nature and circumstances of the offense charged, clearly weighs in favor of detention. Here, a grand jury found probable cause to believe that Defendant APPERSON participated in a serious drug offense that involves an enormous quantity cocaine and heroin. As discussed above, heroin and cocaine pose a very significant danger to our community. The nature of this offense and the statutory presumption therefore weigh heavily in favor of detention. Furthermore, the seriousness of the offense also poses a significant risk of substantial incarceration for the defendant; if convicted, the defendant is facing at least a ten year mandatory minimum term of incarceration. That exposure, in turn, only increases the incentive of the defendant to flee.

42. The second factor, the weight of the evidence, also clearly weighs in favor of detention. As set forth above, this case involves an extensive investigation which included intercepted wire and electronic messages between the defendant and his co-defendants. During the course of this conspiracy, large quantities of narcotics and cash have been seized from coconspirators. Here, the weight of the evidence demonstrating the defendant's role in the conspiracy is strong.

43. The third factor, the history and characteristics of the person, also weighs in favor of detention. According to the Pretrial Services Agency report, the defendant has several prior

misdemeanor convictions related to marijuana and a concealed weapons offense. Moreover, the defendant was on unsupervised probation in Culpeper, Virginia during the course of his involvement in this conspiracy. In addition, the defendant's willingness to assist STINNETT in her escape when facing state charges speaks volumes as to the defendant's risk of flight. Thus, the defendant's history also weighs in favor of detention.

44. The fourth factor, the nature and seriousness of the danger to any person or the community posed by the defendant's release, also weighs in favor of detention. As discussed above, the defendant's activity poses a substantial danger to the community. The members of this conspiracy are involved in the large-scale distribution of heroin and cocaine. In creating the statutory presumption for pretrial detention, as noted above, Congress recognized the high risk of pretrial recidivism of those involved in serious drug trafficking offenses. Moreover, a firearm was recovered from a residence where the defendant stored his narcotics. Here, the continuing danger to the community that is posed by this defendant is quite evident.

45. In the end, given all of these facts and circumstances, the defense simply cannot present evidence sufficient to overcome the statutory presumption that the defendant should be held without bond. Furthermore, even apart from that presumption, the weight of the evidence and the gravity of the alleged offense provide compelling justification for the continued detention of the defendant until this case is resolved.

46. WHEREFORE, the government requests that the Court order the defendant to be detained without bond pending resolution of this case.

Respectfully submitted,

CHANNING PHILLIPS
United States Attorney
D.C. Bar No. 415793

_____/s/______________________
Kara Martin Traster
Assistant United States Attorney
555 4th Street, NW, Room 4110
Washington, DC 20530
(202) 252-6734
Kara.M.Traster@usdoj.gov